UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EDELMAN ARTS, INC.,

                       Plaintiff,

      -against-

ART INTERNATIONAL (UK) LTD., as Agent
for an Undisclosed Principal,

                 Defendant.

06 Civ. 410 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

      Plaintiff Edelman Arts, Inc. ("Edelman Arts") commenced this action on January 19, 2006, against defendant Art International (UK) Ltd. ("Art International"), alleging a single claim against Art International for breach of contract.  Plaintiff, a corporation in the business of buying and selling art, alleges that Art International breached a contract for the sale of a Piet Mondrian painting in the course of a "back-to-back" transaction.  From February 7, 2011, to February 9, 2011, the Court held a three-day bench trial in this matter.  This Memorandum Opinion and Order sets forth findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.  For the reasons that follow, the Court grants judgment to the defendant.

### FINDINGS OF FACT

**I.   The Parties**

      Edelman Arts is a New York corporation in the business of finding and brokering art works for sale both nationally and internationally.  (Stipulation of Facts ¶ 1.)  Its chief executive

and 75 percent owner is Asher Edelman.  (Edelman Tr. 19:18-20:11.)[1]  After graduating college

with a degree in economics in 1961 and a stint with the United States Coast Guard, Edelman

worked in investment banking until 1988.  (*Id.* 22:3-15, 25:9-22, 34:9-12.)  During this time,

Edelman's involvement with the art world was primarily as a collector; Edelman bought his first

paintings in 1961 and had a collection of over a thousand works in the 1970s and 1980s.  (*Id.*

22:19-23:3, 29:5-29:10.)  From 1988 to 1995, Edelman ran a museum in Switzerland called the

Musee d'Art Contemporain.  (*Id.* 34:13-35:4.)  Edelman began brokering art in 2000.  (*Id.* 143:3-

8.)

　　　　Art International is a London-based company organized under the laws of the United

Kingdom that engages in and brokers international transactions involving works of art.

(Stipulation of Facts ¶ 3.)  Its majority shareholder is Anne Faggionato.  (*Id.* ¶ 4.)  Faggionato

has been engaged in the business of curating and brokering art deals since 1979, when she

opened a gallery with her then-husband, David Grob.  (Faggionato Tr. 247:5-254:25.)

Faggionato formed Art International in 1994.  (*Id.* 240:9-250:1.)  At the time of the deal at issue

in this litigation, Art International had three directors: Faggionato, her mother Irene, and Tobias

Thomas.  (*Id.* 255:14-18.)  Thomas worked as a gallery manager at two galleries for several

years prior to working at Art International, which involved the general day-to-day running of

those galleries and some involvement in art deals, though not in price negotiation.  (Thomas Tr.

394:20-397:20.)  Thomas joined Art International in 2002 and became a director there in 2005.

(*Id.* 398:12-24.)

---

[1] The citation format ([Name] Tr. [Page1]:[Line1]-[Page2]:[Line2]) refers to the section of the trial transcript from
[Page1]:[Line1] to [Page2]:[Line2] reflecting [Name]'s testimony.

### II. Edelman's Arrangement of a "Back-To-Back" Transaction

In 2005, Edelman heard from Richard Hines, an art dealer in Seattle, that Hines was in touch with someone who was looking to purchase a Piet Mondrian painting.  (Edelman Tr. 38:17-25, 39:7-16.)  Edelman searched for Mondrians that might be available and heard of two such paintings from Mathieu Ticolat, a French art dealer living in Japan.  (*See id.* 40:7-23.)  One of those paintings was a 1923 Mondrian *Composition* (the "Painting"), the sale of which is the subject of this lawsuit.  (*Id.* 40:11-16.)  Edelman contacted Hines to inform him that two Mondrians might be available for sale.  (*Id.* 41:13-17.)  Hines told Edelman that he or the buyer's representatives wanted to see the Painting.  (*Id.* 46:25-47:3.)  Edelman then arranged a viewing of the painting at Crozier Fine Arts ("Crozier"), an art warehouse, by contacting Ticolat in early October.  (*See id.* 46:25-47:7, 47:24-48:7, 52:7-54:3; *see also* Pl.'s Ex. 1.)  Along with a couple of representatives for the buyer and Crozier representatives, Edelman attended this viewing.  (Edelman Tr. 57:4-22.)

After the viewing, Edelman was contacted by Genevieve Paris, a French private art dealer who had been serving as an intermediary between Hines and the undisclosed buyer.  (*Id.* 58:18-59:1.)  Edelman was familiar with Paris because she had worked for a friend of his, Jean-Gabriel Mitterand, who had an art gallery in Paris.  (*Id.* 59:2-22.)  Edelman negotiated with Paris a price of $6.5 million to be paid for the Mondrian "within three weeks from the date of sale" and a $300,000 deposit to be refunded if there was no purchase.  (Pl.'s Ex. 7; Edelman Tr. 60:16-21.)  Edelman e-mailed Paris on November 7, 2005, with these terms, and Paris replied on November 9, 2005, confirming that Edelman's e-mail reflected her understanding of the terms as well.  (Pl.'s Ex. 7; Def.'s Ex. 111.)

At the same time, Edelman was negotiating the terms of sale for his purchase of the Mondrian from the seller.  (Edelman Tr. 60:22-24.)  On November 6, 2005, Ticolat introduced Edelman to Karl Hutter, owner of a gallery in the business of buying and selling fine art, Karl Hutter Fine Art LLC.  (Hutter Dep. 28:1-5, 37:24-38:22, 57:13-17; *see also* Edelman Tr. 47:8-16; Pl.'s Ex. 7.)  Hutter had the ability to produce the Painting for a viewing at Crozier.  (Hutter Dep. 40:13-20; *see also* Edelman Tr. 62:6-17.)  Indeed, Hutter set up Edelman's first viewing of the Mondrian at Crozier, even though Edelman was dealing with Ticolat at the time.  (*See* Hutter Dep. 45:9-46:24; Edelman Tr. 47:4-16.)  And a person "responsible for" the painting had to authorize such viewings at Crozier.  (Edelman Tr. 50:5-14.)  Edelman negotiated a purchase price of $5.5 million with Hutter.  (Pl.'s Ex. 6; Edelman Tr. 63:17-19.)  An e-mail Hutter sent to Edelman on November 7, 2005, reflected that understanding, included the condition that the sum was to be received no later than twenty-one days after sale, and informed Edelman that the seller was open to a viewing by the buyer's conservator, but required a refundable $300,000 deposit prior to such a viewing.  (Pl.'s Ex. 6.)

By simultaneously negotiating to buy the Painting and to sell it, Edelman was engaged in arranging a back-to-back transaction, one in which an art dealer has both a buyer and seller in place and is prepared to take payment from the buyer and pay its own price over to the seller upon receipt of that payment from the buyer.  (Edelman Tr. 61:12-19.)  Such transactions are common in the art world.  (*Id.* 61:20-22.)

### III. Art International Takes Over for Paris

At some point in the fall of 2005 before November 17, Paris contacted Anne Faggionato and asked her to structure the deal for the Mondrian between Edelman, as seller, and Galerie G, an German gallery that would be purchasing the Mondrian in turn.  (Faggionato Tr. 257:12-

4

258:2, 374:17-375:14.)  Prior to its involvement in the events of this lawsuit, Art International

had used the name "Anne Faggionato" in presenting itself to customers to capitalize on

customers' familiarity with Faggionato's name from her prior art dealings.  (*Id.* 249:16-250:12.)

When Paris asked Faggionato to structure the Mondrian deal, however, she asked that

Faggionato not be on the front line of the transaction.  (*Id.* 260:13-20.)  According to Paris, using

Faggionato's name could risk confusion with her brother, an art dealer who had had prior bad

dealings with James Mayor, another art dealer who had previously offered pieces from

Edelman's collection to Faggionato.  (*See id.* 259:8-19, 272:18-273:8.)  Thomas took various

steps to conceal Faggionato's name in Art International's dealings with Edelman, including

removing her name from the fax machine and the answering machine, as well as limiting the

amount of contact information he included in e-mails.  (*See id.* 265:23-266:5, 272:18-273:8;

Def.'s Exs. 82, 83.)  Instead of Faggionato, Thomas represented Art International in the deal, and

Edelman's conversations were with Thomas only.  (*Id.* 260:13-261:22; Edelman Tr. 75:4-15.)

Allowing Thomas to handle the deal, which was relatively "straightforward" at the time, had

another benefit in Faggionato's mind: it would build Thomas's confidence in publicly handling

such deals while Faggionato could guide him through the deal behind the scenes.  (Faggionato

Tr. 260:13-261:22.)

On November 17, 2005, Paris wrote an e-mail to Edelman requesting that he send the

description sheet and condition report of the Painting to "the buyer's Company," Art

International.  (Pl.'s Ex. 8.)  Edelman was not familiar with Art International or its association

with Faggionato at the time he received the e-mail.  (*See id.*; Edelman Tr. 68:7-9.)  He did learn

of Faggionato's involvement with Art International shortly thereafter.  (Edelman Tr. 146:21-

147:9; Def.'s Ex. 109.)  Later on November 17, Edelman received an e-mail from Thomas

reflecting Art International's understanding that the price of the Painting was $6.5 million and

that the transaction was to be completed within three weeks of the date of invoice.  (Pl.'s Ex. 9.)

Edelman confirmed the accuracy of that understanding and also added that he had informed Paris

that "if there was to be a three week hiatus on payment a $300,000 [deposit] would be required"

and that he would "let [Thomas] know shortly if this deposit is still required."  (*Id.*; *see also*

Edelman Tr. 66:14-22.)

### IV. The Parties Exchange Invoices and Edelman Rejects an Escrow Arrangement

On November 18, 2005, Edelman sent Art International a draft invoice for the Painting

and informed Thomas that if he preferred a twenty-one day payment term, "the owner requires

that I, therefore you, put forth a good faith refundable deposit" of $300,000, but if he could pay

within ten days of the date of invoice, the deposit requirement would be waived.  (Def.'s Ex. 3 at

1.)  The draft invoice identified the painting, a price of $6.5 million, included wire instructions

for Edelman Arts, provided that "[t]itle will not pass until funds are received," and indicated that

the time of payment was yet to be agreed.  (*Id.* at 2.)  Leaving the time of payment open was

intended to allow Art International to elect either the twenty-one day with deposit option or the

ten-day without deposit option.  (Edelman Tr. 234:3-16; *see also* Def.'s Ex. 87.)

In the meantime, Art International was making arrangements for their vision of how the

transaction would proceed.  Martinspeed, London-based shipping agents, faxed a letter to

Thomas on November 17, 2005, confirming its ability to conform to Art International's desire to

use Martinspeed as an escrow agent.  (Def.'s Ex. 1.)  Faggionato instructed Thomas to accept

Martinspeed's services on November 18, 2005.  (Def.'s Ex. 83.)  Art International planned to

have the painting shipped to Martinspeed's warehouse, to have the funds held in escrow by

Martinspeed, and when all parties were satisfied with the transaction, Martinspeed would release

6

the funds to Edelman Arts and release control of the Painting to Art International. (Thomas Tr. 405:19-406:7.)

Art International was also attempting to finalize the deal on its buyer's side as well. Initially, Thomas did not contact Galerie G directly, but dealt instead with a man named Yves Pestalozzi instead on Galerie G's behalf. (Faggionato Tr. 258:18-259:2, 310:3-14; *see generally* Pl.'s Exs. 55, 56, 58.) Faggionato was not initially aware of Pestalozzi's involvement in the transaction and disliked Pestalozzi, but tolerated his involvement because Paris told her it would be minimal. (Faggionato Tr. 258:18-259:2, 310:3-14.)

On November 21, 2005, at Faggionato's instruction, Thomas sent a fax to Edelman notifying him that Art International was "expecting confirmation from the buyer that payment will be immediate upon receipt of our invoice," and proposing an escrow arrangement with Martinspeed acting as escrow agent "[t]o facilitate matters and especially to ensure that no risks are taken with regard to New York sales tax." (Pl.'s Ex. 10; Def.'s Ex. 84; *see also* Def.'s Ex. 83.) Faggionato then informed Thomas of the "ideal chronology" for the transaction. (Def.'s Ex. 87.) In that chronology, Pestalozzi would confirm that payment is upon receipt of invoice that day. (*Id.*) Edelman would then respond to Thomas's message, Thomas would acquire a "definitive invoice," Art International would invoice Galerie G, and Galerie G would immediately confirm receipt and convey the relevant bank information. (*Id.*)

Later that day, Edelman sent an invoice to Thomas specifying that payment was "due upon receipt of invoice," and otherwise containing the same information as the draft invoice. (Pl.'s Ex. 24 at 2; Edelman Tr. 80:3-81:13.) Art International never rejected this invoice. (Edelman Tr. 81:17-19; Faggionato Tr. 321:1-5.) That same day, Edelman received an invoice from Karl Hutter Fine Art, LLC stating that the price of the Painting was $5.5 million, that

"[t]itle does not pass until full payment has been received," and that it was "[s]ubject to receipt of Bill of Sale from the vendor."  (Pl.'s Ex. 25; Edelman Tr. 82:1-19.)  Edelman understood that last provision to indicate that the invoice was subject to two conditions: first, Edelman had to pay Hutter and second, Hutter had to receive an executed bill of sale, which he would receive once he indicated to the vendor that Edelman had paid him.  (Edelman Tr. 83:16-84:3.)  On November 22, 2005, Gudrun Kirchwehm of Galerie G also faxed Art International stating that they were expecting an invoice for the Painting and that the price would be $7,195,000.  (Pl.'s Ex. 86.)  Art International issued an invoice to Galerie G, both through Pestalozzi and directly to Kirchwehm.  (*See* Pl.'s Exs. 84, 85; Def.'s Ex. 16; Thomas Tr. 476:11-24, 489:23-490:18.)  The invoice reflected a price of $7,195,000 that Galerie G was to pay to Art International, identified the Painting, provided that "[p]ayment is due immediately upon receipt of invoice," stated that title does not pass to the purchaser until payment has been received in full, and contained banking information for Galerie G's payment to Art International.  (Def.'s Ex. 16.)

Edelman also wrote to Thomas on November 21, 2005, to reject his proposed escrow arrangement with Martinspeed.  (Edelman Tr. 77:21-79:2; Thomas Tr. 410:16-412:8; Def.'s Ex. 13.)  Edelman believed that the tax rationale for the escrow arrangement was unfounded and that there was "no chance" that Hutter or his seller would have approved shipping the painting to England.  (Edelman Tr. 77:21-78:8, 159:22-160:6; Thomas Tr. 412:2-4.)  Edelman also indicated that the arrangement with Martinspeed was overly complex and that performing a closing in New York would be simpler.  (Edelman Tr. 161:14-17; Thomas Tr. 412:5-8; Def.'s Ex. 13.)  On November 22, 2005, Thomas then notified Pestalozzi that Edelman preferred to "close the deal in New York," and informed Edelman that he was "confident" that he could "persuade" his client to accept a closing in New York.  (Def.'s Exs. 17, 18.)

8

**V.   Art International Attempts To Secure Payment and the Transaction Stalls**

After Art International invoiced Galerie G, Thomas made phone calls, sent e-mails, and sent faxes regularly to Pestalozzi, at first, and Galerie G later on in an effort to secure payment. (Thomas Tr. 418:17-25.)  On November 22, 2005, a Tuesday, Thomas requested via e-mail to Pestalozzi that the invoice he sent to Galerie G be acknowledged.  (Thomas Tr. 419:1-10; Def.'s Ex. 17.)  Pestalozzi responded that he was happy to proceed and that the funds would be ready later that week.  (Thomas Tr. 419:9-13.)  On Thursday, November 24, 2005, Pestalozzi e-mailed Thomas to inform him that "[t]he buyer" confirmed to him that he was selling stock to raise the funds and place them in an escrow account, and that all would be ready at the beginning of the following week.  (Def.'s Ex. 22; Thomas Tr. 420:3-19.)  In reply, Thomas again requested that Galerie G confirm their acceptance of Art International's invoice, which he had not yet received. (Def.'s Ex. 22; Thomas Tr. 420:10-421:2.)  On Tuesday, November 29, 2005, Pestalozzi e-mailed Thomas to report that half of the funds were "liberated in the bank" and that complete payment would be available at "the beginning of next week."  (Def.'s Ex. 23.)

Thomas also requested corresponding postponements for completion of the transaction from Edelman.  On November 23, 2005, Edelman inquired of Thomas whether he had a schedule in mind for closing on the Painting, attempting to get the closing scheduled before the Thanksgiving holiday.  (Def.'s Ex. 20; Edelman Tr. 173:9-17.)  That day, Thomas e-mailed Edelman stating that Art International anticipated that a closing would occur the following week and requesting photos of the back of the Painting as well as information on the crating of the Painting.  (Pl.'s Ex. 11; Edelman Tr. 86:15-87:4.)  Edelman Arts sent the photos to Thomas on November 28, 2005.  (Pl.'s Ex. 30; Edelman Tr. 89:8-20.)  On November 29, 2005, Thomas e-mailed Edelman thanking him for the photos and informing him that Art International expected

9

"the funds to be transferred to Martinspeed at the start of next week," based on Pestalozzi's assurances, and that he would "confirm details as soon as [he] ha[d] a definite timetable." (Def.'s Ex. 24; Thomas Tr. 423:22-424:9.)

Edelman then attempted to cut off further delays.  On November 30, 2005, he wrote Thomas to "suggest we focus on closing as soon as possible" and noting that while "[t]he seller is committed to you . . . [,] another buyer has surfaced and I do not want to leave too much time for second thoughts."  (Def.'s Ex. 26.)  This echoed an earlier November 22 e-mail that Edelman had sent Thomas that suggested that there was a "sudden groundswell in interest in Mondrian paintings" that the market was "bubbly," and that Edelman was "concerned" that his seller would be approached by another buyer.  (Def.'s Ex. 18.)

On December 1, 2005, Thomas e-mailed Pestalozzi again to request confirmation that Galerie G was in possession of Art International's invoice and to inform him that if Galerie G was not in contact by the following morning, Art International would contact Galerie G directly. (Def.'s Ex. 27; Thomas Tr. 425:25-426:11.)  Pestalozzi replied the same day, complaining about the pressure that Art International was exerting on him, expressing concern that Art International might circumvent him to speak with Galerie G directly, and assuring Thomas that "the Mondrian will be payed [sic] in the good condition next week."  (Def.'s Ex. 28; Thomas Tr. 426:19-427:2.) The e-mail also provided a list of excuses for Pestalozzi's delays, including computer and fax problems at Galerie G, and Kirchwehm's absence from Berlin.  (Def.'s Ex. 28; Thomas Tr. 427:3-6.)  At Faggionato's direction, Thomas responded to Pestalozzi on December 2, informing him that it was "unacceptable and unprofessional" that Art International had not yet received an acknowledgement of its invoice, that Art International had "consulted our legal representatives" and been advised to seek confirmation from Galerie G directly, and that Art International was not

trying to cut Pestalozzi out of the deal, but was instead simply exercising "prudent transaction management."  (Def.'s Ex. 29; *see* Pl.'s Ex. 58; Faggionato Tr. 333:24-335:16; Thomas Tr. 428:1-24.)  That day, Paris forwarded to Thomas a copy of a communication purporting to be from "Secretary Henrik Markmann" of Galerie G to Pestalozzi in which Markmann offered excuses for the delay in funds including Kirchwehm's slow selling of stock to raise the funds and a recent hospital stay due to Kirchwehm's health problems.  (Def.'s Ex. 31.)  The communication reassured that "[t]here is no negative sign" regarding the deal and that Kirchwehm would acknowledge the invoice as soon as she was out of the hospital.  (*Id.*; Thomas Tr. 429:10-430:9.)  On December 6, 2005, Thomas still had no confirmation that funds had arrived and wrote to Pestalozzi again asking for an update.  (Thomas Tr. 430:19-431:5; Def.'s Ex. 36.)  Pestalozzi responded that day indicating that he had attempted to contact Kirchwehm unsuccessfully and believed that she was still in the hospital, but hoped for news later that day.  (Def.'s Ex. 37; *see also* Thomas Tr. 431:11-20.)

During this time, Edelman continued to try to schedule a date to close the transaction.  On December 2, 2005, he wrote Thomas and requested that he "tell me on what day you intend to close," and that Edelman was "being asked" about the date of closing.  (Def.'s Ex. 30.)  Edelman was referring to Hutter asking him about the closing date.  (Edelman Tr. 176:25-177:8.)  At the time, Edelman was attending Miami Basel, an art fair for contemporary art in Miami.  (*See* Edelman Tr. 90:16-91:10.)  While he was attending Miami Basel, Edelman spoke with Paris and asked her about the whereabouts of the funds.  (*Id.* 91:11-14.)  On December 5, 2005, Thomas e-mailed Edelman stating that he was "expecting confirmation by tomorrow afternoon that the transfer" of funds "will take place on Thursday," December 8, 2005.  (Def.'s Ex. 33; Edelman Tr. 92:10-21.)  Edelman replied the same day, telling Thomas that Paris had indicated that the

11

funds would be available on December 5, which is what he "conveyed to [his] client," and that a closing had to take place that week.  (*Id.*; Edelman Tr. 92:22-25.)  Edelman e-mailed Thomas again on December 5, noting that he had not heard from Thomas that day regarding the day of the closing and requesting a definite timetable, and e-mailed again on December 7, indicating that it was "important we set a fixed schedule <u>today</u>!"  (Def.'s Exs. 34, 39 (emphasis in original).)

### VI. Edelman Makes Further Efforts To Schedule the Closing and Art International Contacts Galerie G Directly To Verify Availability of the Funds

On the morning of December 8, 2005, Thomas e-mailed Kirchwehm directly to request a definite date on which Art International could expect the funds from Galerie G, noting that Art International was "being placed under enormous pressure from the seller to cancel the sale." (Def.'s Ex. 46; Thomas Tr. 434:3-435:4.)  Thomas also e-mailed Pestalozzi that day to reassure him that Art International was not trying to cut him out of the deal.  (Def.'s Ex. 46; Thomas Tr. 435:5-10.)

A third morning e-mail went to Edelman, telling him that "the buyer has asked for an extension [of the closing date] so that they can transfer the funds on Monday," December 12. (Def.'s Ex. 43; Edelman Tr. 95:17-25.)  Edelman and Thomas had a conversation regarding Edelman's concerns that there might be a "dealer scam," a situation in which a dealer tries to tie up a picture without actually having a buyer to shop the picture around.  (*See* Edelman Tr. 97:5-24; Thomas Tr. 438:21-439:15.)  Thomas e-mailed Edelman on the afternoon of December 8, stating that he could not "rule out the possibility of a dealer group," but that his concern regarding the delays was one of "circumvention," the possibility that someone in the buyer chain was attempting bypass Art International.  (Def.'s Ex. 48; Thomas Tr. 439:16-25.)  In response,

12

Edelman assured Thomas that there would be "no circumvention if the buyer is real and lives up to the schedule this time." (Def.'s Ex. 48.)

Galerie G's Secretary Henrik Markmann sent Thomas a fax on the afternoon of December 8, 2005, responding to his e-mail. (Def.'s Ex. 41.) The fax informed Thomas that the funds would be available on December 12 or 13 and that 45% of the funds were currently in escrow. (*Id.*) The fax also asked a number of other questions regarding the nature of Art International, whether transfer of the Painting could be guaranteed, and how Galerie G could be assured of how the transaction would proceed, questions which surprised Thomas given how late in the process they were being asked. (*See id.*; Thomas Tr. 432:14-433:13.) Thomas also received an e-mail from Galerie G that day informing him that Kirchwehm had been told by her lawyer that "everything is in order." (Def.'s Ex. 47.) As of December 8, Art International had not received any written confirmation that funds had been transferred into the Martinspeed account to which it had requested Galerie G send funds. (Thomas Tr. 440:20-23.)

### VII.   Edelman Schedules the Closing and the Parties Exchange Bills of Sale

On December 9, 2005, Edelman scheduled a closing for December 13, 2005. (*See* Edelman Tr. 100:18-22; Thomas Tr. 441:15-23; Def.'s Ex. 49.) That day, Edelman sent Thomas a bill of sale (the "Edelman-Art International Bill of Sale") and asked Thomas to convey any comments regarding the bill of sale by the morning of Monday, December 12, 2005. (Pl.'s Ex. 14.) Also on that day, Hutter sent a second amended bill of sale to Edelman (the "Hutter-Edelman Bill of Sale"). (Pl.'s Ex. 13.) Hutter and Edelman had already agreed to terms prior to Edelman's sending of the Edelman-Art International Bill of Sale to Thomas, but the amendment addressed some minor changes, such as the proper name of Edelman Arts. (*See* Edelman Tr. 123:6-16; Pl.'s Ex. 13.)

The draft Edelman-Art International Bill of Sale contained several representations.  In the Bill of Sale, Edelman Arts warranted that good, valid, and marketable title would pass to Art International; that the Painting was genuine; that at the time of transfer, Edelman Arts was the sole and legal owner of the Painting; that Edelman Arts was not aware of any competing ownership claims; that Edelman Arts had provided all information of which it was aware regarding the authenticity, description, provenance, and title of the Painting; that Art International was purchasing the Painting "as-is"; that New York law governed the agreement; and that "[p]hysical delivery will be effected upon the receipt of cleared funds by the seller." (Def.'s Ex. 50 at 2-3.)  The Hutter-Edelman Bill of Sale contained similar representations, specifically providing that "[t]itle does not pass until full payment is received by the Seller." (Def.'s Ex. 61 at 3.)

On December 12, 2005, Thomas e-mailed Edelman to inform him that Art International was "looking over [the bill of sale] . . . and will let you know shortly if we require any alterations."  (Pl.'s Ex. 15.)  Thomas further informed Edelman that he "had confirmation that all funds will be in a Swiss bank account this afternoon," which he had received from either Pestalozzi or Galerie G.  (*Id.*; Thomas Tr. 442:25-443:10; *see also* Def.'s Ex.53.)  The e-mail continued on to say that "because of the checks the bank has to carry out on a sum this size," the funds would "not be transfered [sic] to Martinspeed until tomorrow afternoon at the earliest and possibly not until Wednesday morning."  (Pl.'s Ex. 15)  Thomas then asked whether Edelman wanted to postpone the closing, and added that he was "happy to proceed on the basis of confirmation from the buyers['] bank that the funds have been sent."  (*Id.*)  Edelman and Thomas had a subsequent conversation in which they agreed to proceed on schedule and that the Painting would be released later when the funds arrived.  (*Id.*; Edelman Tr. 104:15-105:18.)  Prior to this,

Edelman and Thomas had discussed generally what would happen at the closing; in particular, Edelman informed Thomas that a Martinspeed representative would examine the Painting to make sure it was the correct painting, that it would be crated and sealed in such a way that no one could open it until it was shipped into Art International's possession, which would happen after payment.  (Edelman Tr. 106:6-23.)  Hutter made the arrangements for the closing to take place on December 13, 2005 at 11:00 a.m. EST at Crozier.  (Edelman Tr. 126:2-20; Pl.'s Ex. 16.)

## VIII.   The Addition of "In Escrow" Language in Fax Cover Sheets to the Edelman-Art International Bill of Sale

On the afternoon of December 12, 2005, Edelman e-mailed Thomas to request "the name and address to whom I am selling" and requesting that Thomas give the address for Art International and "authorize Mr. [David] Cohen," the Martinspeed representative who was to attend the closing, "to sign the Bill of Sale on your behalf."  (Pl.'s Ex. 17; Thomas Tr. 448:3-15.) At 1:55 a.m. on December 13, 2005, Faggionato e-mailed Thomas to "confess" that she was "a little nervous" about the transaction because the numerous excuses Galerie G had offered for the delay in funds.  (Def.'s Ex. 58; Faggionato Tr. 284:14-286:14.)  The e-mail instructed Thomas that "nothing gets signed until Martinspeed has the money" and told him to inform Kirchwehm at Galerie G of the importance of receiving a document from the bank confirming the availability of funds.  (Def.'s Ex. 58; Faggionato Tr. 284:14-286:14.)  On December 12, Thomas had e-mailed Kirchwehm, referencing a telephone conversation he had had with her earlier in the day in which she had said that the funds would be ready in a Swiss bank account shortly, to request that she send a confirmation from the bank that funds were on their way to Martinspeed.  (*See* Def.'s Ex. 53; Thomas Tr. 446:21-447:13.)  Thomas never received such a confirmation from Kirchwehm.  (Thomas Tr. 447:5-13.)

Thomas responded to Edelman's requests on the morning of December 13, 2005.  (*See* Def.'s Ex. 57.)  In his response, Thomas provided Art International's address, stated that Art International was "happy with the proposed bill of sale and [didn't] require any changes to the terms within the draft," and informed Edelman that only a director of Art International could sign the bill of sale, not Cohen.  (*Id.*)  Thomas also requested that Edelman send the original copy of the bill of sale to him via Federal Express, and notified Edelman that he would "be in touch as soon as [he] ha[d] the transfer details from Switzerland."  (*Id.*)  He indicated that he would return the bill of sale via Federal Express as well, which would have caused Edelman to receive a fully executed copy after the closing.  (*Id.*)

Edelman then had a telephone conversation with Thomas in which he informed Thomas that he could not wait to receive an executed bill of sale by Federal Express, but instead required the signed document in hand prior to the closing.  (Edelman Tr. 111:6-13; Thomas Tr. 445:7-17.) Thomas told Edelman that he could not sign the bill of sale because the funds had not yet arrived in Martinspeed's escrow account for Art International.  (*See* Thomas Tr. 445:18-21.)  Sometime thereafter, Edelman and Thomas had another conversation in which Edelman proposed that he hold the bill of sale in escrow until arrival of the funds.  (*Id.* 445:25-446:6.)  Thomas informed Edelman that he would "speak to the other director of the gallery," Faggionato, "and see if that was acceptable to her."  (*Id.* 446:8-11.)  At the time, Faggionato was on vacation with her family in South America.  (Faggionato Tr. 287:13-17, 288:8-12.)  Thomas called Faggionato and informed her of the proposed escrow arrangement.  (Thomas Tr. 446:12-15; 538:8-10.) Faggionato instructed Thomas that the arrangement was acceptable, but Beachcroft Wansbroughs, Art International's lawyers, should draft the escrow agreement.  (*Id.*; *see also* Faggionato Tr. 291:18-292:11.)  Thomas then called Edelman and told him that Art International

was going to run the arrangement past its lawyers, but Edelman told him that it would not be

necessary to do so as the language would be self-explanatory.  (Thomas Tr. 538:11-20;

Faggionato Tr. 292:15-18.)

Shortly before the scheduled 11:00 a.m. closing, Edelman faxed the Edelman-Art

International Bill of Sale, signed by Edelman on Edelman Art's behalf, to Art International.  (*See*

Pl.'s Ex. 18.)  On the fax cover sheet, Edelman included the following language:

URGENT

Dear Tobias

Please find attached the Bill of Sale executed by me and to be held in escrow until
such time as your monies are received.  Please sign and return to me by fax in the
next 45 minutes.  We will Fed Ex a final signature copy to you today.  You have
payment instructions on the invoice that I sent to you previously.

I understand that Art International UK Ltd. Is [sic] acting as agent and the Bill of
Sale will be held in escrow by me until the monies from the buyer have been
received.

With Best Regards,

Asher B. Edelman.

(Pl.'s Ex. 18.)  Thomas called Faggionato, relaying Edelman's comments and the language in the

cover sheet, and Faggionato authorized him to sign the bill of sale.  (Thomas Tr. 538:21-539:7;

Faggionato Tr. 292:12-293:2.)

Edelman testified that Thomas did not say that he would not execute the document unless

it was conditioned upon the receipt of funds and that his understanding of the language in his fax

cover sheet was added because he "was not prepared in any way, shape, or form to give

[Thomas] any evidence of title with which he could proceed to try to sell the picture to other

people" and because Edelman "had made representations in the bill of sale that [he] was not

making if [he] didn't actually get paid for it."  (Edelman Tr. 112:15-20, 115:17-116:20.)  This

17

explanation, however, is not credible.  First, the bill of sale itself states that "[p]hysical delivery

will be effected upon the receipt of cleared funds by the seller."  (Pl.'s Ex. 59 at EAI 061.)  If

Thomas were to use the bill of sale as evidence of title, his charade would have been discovered

quickly, as he would not have been able to produce the painting for a viewing without the

assistance of Edelman (and Hutter through Edelman).  And second, the copy of the bill of sale

that Edelman faxed to Art International bore Edelman's signature.  (*Id.*)  If Edelman truly wished

to prevent Art International from using a fully executed bill of sale as evidence of title, the

logical course of action would have been to fax an unsigned bill of sale to Art International, to

sign the copy that Art International faxed back to him, and to bring that copy to the closing.  That

course of action would have left Edelman with the sole copy of the fully executed document.

Instead, Edelman left Art International with the ability to retain its own fully executed copy of

the bill of sale.

Thomas signed the bill of sale, and added the annotation "(AS AGENT)" next to his

signature.  (Pl.'s Ex. 19 at EAI 067.)  At 10:54 a.m. EST (3:54 p.m. in London), just minutes

before the closing was scheduled to begin, Thomas faxed the signed copy back to Edelman, and

included the following language on the fax cover sheet:

> Dear Mr Edelman
>
> Please find on the following pages the Bill of Sale which we have signed as agent
> and understand will be held in escrow until the monies from the buyer have been
> received.
>
> Yours sincerely
>
> Tobias Thomas

(Pl.'s Ex. 19.)  This language indicated the understanding that the bill of sale "would not be active until such time as [Art International] received the funds and were ready to proceed." (Thomas Tr. 452:8-14.)

## IX. The Closing

At the closing, David Cohen, the Martinspeed representative, examined the Painting and confirmed that it was genuine.  (Edelman Tr. 128:5-14; Thomas Tr: 455:18-25.)  The Painting was then crated and sealed with wire, which had a code number attached to it, and in wax, although it could be uncrated if the sale was not completed.  (Edelman Tr. 128:5-14, 203:23-204:5; *see also* Hutter Dep. 64:11-13.)  Edelman also executed the Hutter-Edelman Bill of Sale at the closing.  (Edelman Tr. 131:15-17; Pl.'s Ex. 20; *see also* Hutter Dep. 113:19-114:2.)  The Hutter-Edelman Bill of Sale contained no conditions precedent and was not held in escrow pending receipt of money.  (Edelman Tr. 132:3-5, 213:6-15.)  Because Edelman anticipated receiving funds from Art International on December 14, (Edelman Tr. 133:24-134:1), Edelman informed Hutter that the payment would be a day or two late, and Hutter waived the requirement in the Hutter-Edelman Bill of Sale that payment was due immediately upon signing.  (Edelman Tr. 213:16-214:1.)

Afterwards, Thomas spoke both with Edelman and with Tony Chapman of Martinspeed, who both reported that the event had gone satisfactorily.  (Thomas Tr. 456:1-9, 493:12-17.)

## X.  The Transaction Collapses As Art International's Efforts To Secure Funding Fail

Although Edelman dubbed the December 13, 2005 event a "physical closing," Hutter never acquired title to the Painting, and neither did Edelman Arts or Art International, as the proposed transactions between these actors were never consummated.  (Stipulation of Facts ¶¶ 10-13.)  On December 14, 2005, Edelman e-mailed Thomas, telling him that he should inform

Paris and "whomever she represents" that funds were expected that day.  (Def.'s Ex. 63; Thomas Tr. 457:1-458:8.)  Edelman also expressed skepticism at the excuses for the lack of funds that Galerie G had made and that Thomas had conveyed to Edelman and demanded a 25 percent payment by December 15.  (Def.'s Ex. 63; Thomas Tr. 457:1-458:13.)  Art International did not provide that 25 percent payment.  (Thomas Tr. 458:1-8.)  That same day, Thomas sent a fax to Kirchwehm at Galerie G expressing surprise that Galerie G was still questioning the terms and conditions of the transaction this late in the process and demanding immediate payment or a substantial deposit.  (Pl.'s Ex. 69.)  On December 15, 2005, Gil Edelson, a partner with Katten Muchin Rosenman LLP, sent a letter to Thomas on Edelman Arts' behalf, which asserted that Edelman Arts was "ready, willing and able to perform its part of the agreement" and demanded the identity of Art International's undisclosed principal and the principal's bank information relating to the transaction.  (Pl.'s Ex. 46; Edelman Tr. 138:25-139:19.)  On December 16, 2005, Edelman e-mailed Thomas directly, stating that he was "threatened with a lawsuit here," that Thomas had "turned off your phones so to speak," and that Thomas had failed to respond to the demands in the Edelson letter, (Def.'s Ex. 64), although Hutter never actually threatened Edelman with a lawsuit, (Hutter Dep. 133:6-14).  Art International did not provide the name of its principal.  (Edelman Tr. 222:17-19.)

At some point before December 28, 2005, Thomas was contacted by David Remsing, a Los Angeles-based art dealer, who purported to represent the seller of the Painting and inquired of Thomas why the transaction was taking so long to complete.  (*See* Thomas Tr. 462:16-463:17; Def.'s Ex. 67.)  Thomas informed Edelman that he had been contacted by Remsing and asked Edelman his opinion about how to proceed with respect to Remsing; Edelman's only response was that he did not want to cut Hutter out of the deal.  (Def.'s Ex. 67.)  On December 30, 2005,

Edelman informed Thomas, Paris, Hines, and another person on the buyer's side of the transaction that he would be pursuing legal action and requested the identity of Art International's principal.  (*See* Def.'s Exs. 70-72.)  Edelman did not obtain that information and commenced suit against Art International as agent for an undisclosed principal in this Court on January 19, 2006.  (*See* Edelman Tr. 231:19-23; *see, e.g.*, Compl. ¶¶ 6-21.)  While Edelman was commencing legal action, Hutter also sought reimbursement from Edelman for expenses incurred in the course of the failed transaction and opined that Edelman had rushed to close the transaction before it was ready.  (*See* Def.'s Exs. 76, 77, 79, 80; Hutter Dep. 145:14-147:9.)  Edelman did not pay Hutter's expenses.  (Hutter Dep. 147:22-25.)

## CONCLUSIONS OF LAW

The parties agree that New York law applies to this diversity action.  Under New York law, "[i]n order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach."  *Diesel Props S.r.l. v. Greystone Business Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

### I.   The Fax Cover Sheets Form Part of the Contract

 "Under New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together . . . .'"  *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 89 (2d Cir. 2005) (quoting *This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998)); *accord Nau v. Vulcan Rail & Constr. Co.*, 36 N.E.2d 106, 110 (N.Y. 1941) ("All three instruments were executed at substantially the same time, related to the same subject-matter, were contemporaneous writings and must be read together as one."); *Trade*

21

*Bank & Trust Co. v. Goldberg*, 330 N.Y.S.2d 69, 70-71 (N.Y. App. Div. 1972).  New York courts applying this standard have held cover letters transmitted with and commenting upon a proposed contract to constitute part of the contract as a matter of law.  *See BGL Dev., Inc. v. Xpedite Sys.*, 184 F. Supp. 2d 360, 361 (S.D.N.Y. 2002); *Nau*, 36 N.E.2d at 110.  And this Court held as a matter of law that the cover faxes constituted part of the contract in resolving Art International's motion for summary judgment.  (*See* Tr. of Feb. 23, 2010 Hr'g at 14:25-15:10.)  The Court adheres to that holding today, not only because it is the law of the case, *see Prisco v. A&D Carting Corp.*, 168 F.3d 593, 607 (2d Cir. 1999), but also because nothing at trial disturbed the Court's conclusion on summary judgment that the documents all formed part of the same transaction.

**II.  The Cover Sheets Establish a Condition Precedent, Which Was Not Satisfied**

It is undisputed that Art International never paid the $6.5 million purchase price for the Painting specified in the bill of sale.  Art International's primary defense at trial against a finding that it breached the contract was that the cover sheets established a condition precedent to the validity and enforceability of the bill of sale.  "A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises."  *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995) (internal quotation marks omitted); *accord MHR Capital Partners LP v. Presstek, Inc.*, 912 N.E.2d 43, 47 (N.Y. 2009); Restatement (Second) of Contracts § 224 ("A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."); 13 Williston on Contracts § 38:7 (4th ed.) ("A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or contractual duty arises.").  New

York law recognizes two types of conditions precedent: the first type "describe[s] acts or events which must occur before a party is obliged to perform a promise made pursuant to an existing contract" and the second is a "condition precedent to the formation or existence of the contract itself." *Oppenheimer*, 660 N.E.2d at 418; *accord SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 341 (2d Cir. 2004) (recognizing that New York law has two types of conditions precedent, "a condition that must occur before a party's performance under an existing contract becomes due" and "a condition to the formation of the contract itself").  "In the latter situation, no contract arises 'unless and until the condition occurs.'"  *Oppenheimer*, 660 N.E.2d at 418 (quoting Calamari and Perillo, Contracts § 11-5, at 440 (3d ed.)).  As for the former, a failure to fulfill the condition "excuses performance by the other party whose performance is so conditioned." *Merritt Hill Vineyards Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077, 1081 (N.Y. 1984).

Edelman Arts's position at trial was that the fax cover sheets established only a timing provision.  The issue of whether the language in the cover sheets establishes a timing provision or a condition precedent is a matter of contract interpretation generally dependent on the intention of the parties.  13 Williston on Contracts § 38:13 ("Whether contractual language is deemed to be language of condition or language of promise is, as is the case with most matters of interpretation, generally dependent upon the intention of the parties. . . .  [T]he determination whether a contract term is a promise or a condition is a problem of interpretation, so that each case turns on its own facts."); Restatement (Second) of Contracts § 226, cmt. a ("Whether the parties have, by their agreement, made an event a condition is determined by the process of interpretation.  That process is subject to the general rules [of contract interpretation].").

Here, the intent of the parties was clear.  The parties intended to have the bill of sale be inoperative until such time as Art International received funds from its undisclosed buyer, Galerie G.  That intent is evinced by several pieces of evidence adduced at trial.  First, Edelman stated that he would hold the bill of sale "in escrow" until funds from the buyer had been received.  "Placing a signed contract in escrow is simply a way of creating a condition precedent to the contract's validity . . . ."  *Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650, 659 (2d Cir. 1996); *accord Spina v. Ferentino*, 294 N.Y.S.2d 721, 722 (N.Y. App. Div. 1968).  Of course, the arrangement "was not a true 'escrow' arrangement because delivery was to the other party to the agreement."  *Menna v. State*, 197 N.Y.S.2d 528, 530 (N.Y. App. Div. 1960).  Nevertheless, Edelman's use of the term—one with which he is familiar, (*see* Edelman Tr. 27:4-10)—is probative of an intent to condition the effectiveness of the bill of sale on the conditions of the "escrow" arrangement.

Second, the evidence reflects a growing nervousness on Art International's part leading up to the closing regarding whether funds would actually arrive from Galerie G.  By December 12, Art International still had not received confirmation that funds were en route from Galerie G's bank, and questioned whether the closing should still proceed, expressing a willingness to go forward only on the basis of confirmation from Galerie G's bank that funds were on their way.  (*See* Pl.'s Ex. 65.)  Early in the morning on December 13, Faggionato instructed Thomas that "nothing gets signed until Martinspeed has the money" and told him to inform Kirchwehm at Galerie G of the importance of receiving a document from the bank confirming the availability of funds.  (Def.'s Ex. 58; Faggionato Tr. 284:14-286:14.)  And that day, Thomas applied pressure to Kirchwehm to obtain details of the transfer of funds from Galerie G to Art International.  (*Id.* Ex. 68.)  Thomas's e-mail to Edelman on the morning of the closing also

reflects his preoccupation with receiving funds from Galerie G, as he mentioned therein that he would contact Edelman "as soon as [he] ha[d] the transfer details from Switzerland" regarding the Galerie G-Art International transfer of funds.  (Def.'s Ex. 57.)

And third, the evidence shows that Edelman proposed the "escrow" arrangement to assuage Thomas's concerns about signing the bill of sale without the assurance that funds would be arriving to allow him to complete the transaction.  At first, Thomas refused to sign the bill of sale on the grounds that Art International still had no confirmation that funds were forthcoming, but eventually did sign the bill of sale, relying on Edelman's oral and written representations that the bill of sale would not be operative until funds from Galerie G had been received.  Art International considered having its lawyers at Beachcroft Wansboroughs draft an escrow arrangement to formalize Edelman's representations.  Indeed, Art International had proposed a formal escrow arrangement involving Martinspeed weeks earlier.  In the short timeframe between Edelman's phone call and the closing, however, Thomas was swayed by Edelman's assurances that the "in escrow" language would speak for itself.  Such facts are indicative of the parties' intent to hold the bill of sale inoperative until such time as funds were received by Art International from Galerie G.  It is a "fundamental . . . precept of contract interpretation . . . that agreements are construed in accord with the parties' intent."  *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002).  Here, that intent was to create a condition precedent to formation of the contract.

Edelman Arts levels several objections against that conclusion.  First, it relies heavily on language from the Second Circuit's decision in *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1099-1100 (2d Cir. 1992), where the court noted that "[c]onditions are not favored under New York law, and in the absence of unambiguous language, a condition will not be read into

the agreement."  The Court previously denied Art International's motion for summary judgment, finding that the language in the fax cover sheets was "not sufficiently definite and precise so as to establish a condition precedent as a matter of law" and that "[a] reasonable fact finder could interpret the language to mean one of at least two things."  (Tr. of Feb. 23, 2010 Hr'g at 17:8-11.)  According to Edelman Arts, this represents a finding of ambiguous language and the Court, by denying Art International's motion for summary judgment on this ground, effectively paved the way for judgment to be granted to Edelman Arts.

*Ginett* is not to be read so expansively.  Rather than establishing a bright-line rule whereby the presence of ambiguous written language in a contract mandates a conclusion that the language cannot establish a condition precedent, *Ginett* merely reiterates the well-established "interpretive preference" under New York law under which courts typically "interpret doubtful language as embodying a promise or constructive condition rather than an express condition." *Oppenheimer*, 660 N.E.2d at 418.  Thus, New York courts have repeatedly stated that if contract "language is in any way ambiguous, the law does not favor a construction which creates a condition precedent."  *Ashkenazi v. Kent South Assocs., LLC*, 857 N.Y.S.2d 693, 694 (N.Y. App. Div. 2008); *accord Torres v. D'Alesso*, 910 N.Y.S.2d 1, 10 (N.Y. App. Div. 2010); *Lui v. Park Ridge at Terryville Ass'n*, 601 N.Y.S.2d 496, 499 (N.Y. App. Div. 1993); *Vincent v. Seaman*, 544 N.Y.S.2d 225, 227 (N.Y. App. Div. 1989).  And "a contractual duty ordinarily will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition."  *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 594 N.E.2d 571, 573 (N.Y. 1992).

Instead of an absolute, formalistic rule concentrating on whether written language is ambiguous, however, these principles express an interpretive preference dedicated to finding an

"an unambiguous *intent* to condition the contract's formation" on the language in question.  *See, e.g.*, *Restaurant Creative Concepts Mgmt., LLC v. Northeast Restaurant Development, LLC*, 920 N.Y.S.2d 816, 818 (N.Y. App. Div. 2011) (emphasis added); *Norgate Homes, Inc. v. Central State Bank*, 440 N.Y.S.2d 51, 53 (N.Y. App. Div. 1981) ("The *intent* of the parties, adduced from a reading of the entire contract, was to import an obligation on the seller to seek and obtain approval as a condition precedent to the exercise of a right to terminate." (emphasis added)); *Thor Properties, LLC v. Chetrit Group LLC*, No. 650514-09, 2010 WL 1740752, at *4 (N.Y. Sup. Ct. Apr. 29, 2010) ("In order to ascertain whether a condition precedent exists, the Court must ascertain the intent of the parties as expressed in the contract.").  Thus in *Diesel Props S.r.l. v. Greystone Business Credit II LLC*, the Second Circuit, applying New York law, saw "no error in the district court's determination that the contract documents were ambiguous" as to whether they contained a condition precedent and affirmed the district court's admission of extrinsic evidence as to the parties' intent to find that the parties did intend a condition precedent.  631 F.3d at 53-54; *cf. DeVito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 654 (2d Cir. 1994) (applying general contract principles and stating that "[i]t is at least ambiguous whether this language reflects an intent by the parties to create a condition precedent . . . .  To the extent that this ambiguity exists, a textual analysis of the Agreement may be supplemented by an exploration of extrinsic evidence concerning the parties' intent . . . .").

As in *Diesel Props*, while examination of the language of the fax cover sheets alone might yield some ambiguity with respect to whether the parties intended to create a condition precedent, the extrinsic evidence resolves any such ambiguity.  Although Edelman did not propose a formal escrow arrangement, which would have conclusively established a condition precedent, the more informal arrangement here was geared toward the same end: the agreement

was to be held inoperative by the parties until such time as funds from Galerie G arrived in Art International's account.  Relying upon that arrangement, Thomas signed the bill of sale with the full understanding that funds had not yet arrived and that he was presently unable to complete the transaction.

Additionally, the circumstances in this case show that the risk of Galerie G's funds not arriving is properly allocated to Edelman Arts.  Edelman, in an abbreviated timeframe, needed a signed bill of sale before the closing.  Thomas would not sign it because he had no independent confirmation at the time that funds were en route from Galerie G, but Edelman persuaded him to sign it by proposing to hold the bill of sale inoperative—and risking non-completion of the transaction—until such time as the funds were received from Galerie G.  Under such circumstances, the general interpretive preference against a condition precedent carries less weight.  *See* Restatement (Second) of Contracts § 227, cmt. b ("When . . . the nature of the condition is such that the uncertainty is not likely to be resolved until after the obligee has relied by preparing to perform or by performing at least in part, he risks forfeiture. . . .  If it is not within his control, it is sufficiently unusual for him to assume the risk that, in case of doubt, an interpretation is preferred under which the event is not a condition.  The rule is, of course, subject to a showing of a contrary intention, and even without clear language, circumstances may show that he assumed the risk of its non-occurrence."); *see also* 8 Corbin on Contracts § 30.15 ("If one promises to pay money out of funds yet to be acquired, the problem arises whether the acquisition of the fund is a condition of the promisor's duty to pay or whether the provision should be interpreted as a promise that the fund will be acquired.  These cases focus around two concerns: whether the parties were simply setting a time for performance and which party either assumed the risk or is better able to bear the risk.").

Furthermore, the evidence does not accord with Edelman Arts's alternative interpretation—namely, that the language merely expressed a timing provision pursuant to which Edelman would retain the bill of sale until such time as Edelman received funds from Art International, the "buyer."  (*See* Pl.'s Post-Trial Mem. ¶ 137.)  Thomas signed the bill of sale "as agent," and it makes little sense for "the buyer" to refer to Art International given that caveat in signing.  Thomas had also used "buyer" to refer to Galerie G in previous communications with Edelman, and the sudden change in terminology under Edelman Arts's interpretation is not explained.  (*See, e.g.*, Def.'s Exs. 48, 52.)

Edelman Arts also argues that any condition precedent would contradict the bill of sale's statement that "[p]ayment is due upon signing of this agreement."  (*See* Pl.'s Ex. 18.)  "Parol testimony is admissible to prove a condition precedent to the legal effectiveness of a written agreement, if the condition does not contradict the express terms of such written agreement." *Hicks v. Bush*, 180 N.E.2d 425, 427 (N.Y. 1962).[2]  "However, the line between consistent and inconsistent conditions precedent may be a fine one."  *Intercontinental Monetary Corp. v. Performance Guarantees, Inc.*, 705 F. Supp. 144, 149-50 (S.D.N.Y. 1989).  Presumably, a condition precedent would contradict the statement in question because while the statement implies immediate performance, a condition precedent would contemplate delays in performance.  But the provision in the bill of sale appears directed more at ensuring prompt performance of each party's responsibilities under the bill of sale once it was valid and effective than it does at mandating that Art International actually render funds at the time it signed the agreement.  Indeed, at the time Art International signed the bill of sale, Edelman knew that it still

---

[2] *Hicks* dealt with an oral condition precedent, in contrast to the condition here, which appeared in writing, but whose ambiguity is being resolved by parol evidence.  Even assuming that the *Hicks* rule that the condition cannot contradict the express terms of the written agreement applies, it does not compel Edelman Arts's conclusion, as detailed below.

did not have the funds necessary to complete the transaction.  And every invoice in this transaction, as well as the Hutter-Edelman Bill of Sale, contained similar provisions, and no entity in this transaction ever actually rendered payment.  Under the circumstances of this case, the condition precedent does not contradict the terms of the written agreement.  *See Morgan Stanley High Yield Secs., Inc. v. Seven Circle Gaming Corp.*, 269 F. Supp. 2d 206, 218 (S.D.N.Y. 2003) (noting that where plaintiffs argued that a "time is of the essence" clause conflicted with a condition precedent because it "suggest[ed] that the parties did not anticipate any delays in performance," that "[t]he provision simply assures—assuming there is a valid contract—that the parties will discharge their responsibilities promptly" and finding "that the alleged condition precedent does not 'in a real sense contradict[s] [this] ter[m] of the written agreement'" (quoting *Hicks*, 180 N.E.2d at 427)).

It was undisputed at trial that the subject of the condition precedent, *i.e.*, that funds be received from Galerie G, never occurred.  Edelman Arts argues that the condition precedent should nevertheless be disregarded because it was impossible to perform.  Impossibility excuses the non-occurrence of a condition precedent if the occurrence of the condition is not a material part of the agreement and forfeiture would otherwise result.  Restatement (Second) of Contracts § 271; *accord* 14 Williston on Contracts § 43:14 ("[I]t is generally true that if a condition precedent to one party's duty to perform does not occur, . . . he or she will be excused from further performance under the contract, even when the nonoccurrence is itself excused as the result of impossibility or impracticability.  However, if the condition is of only minor importance, its happening is a mere technicality, and a forfeiture will result by insisting upon its occurrence, the nonoccurrence as a result of impossibility or impracticability will be excused, and the duty that was subject to the condition's occurrence will become absolute despite its

failure to occur.").  Here, however, the condition was clearly a material part of the agreement.
Thomas testified that he would not have signed the bill of sale but for Edelman's addition of the
"in escrow" language, and Edelman was able to coax Thomas into doing so just before the
closing on the basis of that language.  The occurrence of the condition, therefore, should not be
excused.

Edelman Arts also levels a number of factual arguments that attempt to undermine the
conclusion that the parties intended to form a condition precedent.  First, Edelman Arts argues
that there was no logical reason for Edelman Arts to condition the bill of sale upon Art
International's receipt of funds from a third party before it bound itself to an unconditional bill of
sale with Hutter.  The evidence in this case, however, shows that Edelman was determined to
"close" the transaction by December 13, despite Thomas's protestations that Art International
still lacked funds at that time.  The logical reason to condition the bill of sale on the receipt of
funds from Galerie G, therefore, was simply that it was the only way to induce Thomas to sign
the bill of sale prior to the "closing."  Second, Edelman Arts points to Art International's
communications that it was happy with the draft bill of sale, that it required no changes to the bill
of sale, and could sign and return it via FedEx as being inconsistent with Art International's
proffered intent to create a condition precedent.  The fact remains, however, that when Art
International made those communications, it had not yet signed the bill of sale, and the evidence
shows that it was unwilling to do so until such time as it received assurances (at least from a
bank, as opposed to Galerie G, Pestalozzi, or Paris) that funds were en route.  Art International's
communications to Edelman indicate its satisfaction with the form of the bill of sale, but not
necessarily with the time of execution.  And third, Edelman Arts argues that because Art
International did not specifically take the legal position that its obligations were subject to a

condition precedent in its communications with Edelman Arts after the closing, it is not credible that the parties intended a condition precedent.  But Art International is not a group of lawyers and is not expected to assert every legal defense available to it in informal communications in order to preserve such defenses.  Moreover, most of Art International's post-December 13 communications were dedicated either to further efforts at securing funds, (*see, e.g.*, Pl.'s Exs. 71, 73-75), or at extending the timeline in the hopes that the transaction might yet be completed, (*see, e.g.*, Def.'s Exs. 67, 70), as opposed to setting out Art International's legal position comprehensively.

Lastly, Edelman Arts argues that a condition precedent makes little sense in this case because it had issued an invoice on November 21, 2005, that was never voided.  In Edelman Arts's estimation, it is "absurd" that Edelman would have chosen to place a condition precedent on the bill of sale, as he had an unconditional, binding document prior to the bill of sale being signed.  (Pl.'s Post-Trial Mem. ¶ 162.)  Of course, Edelman could have chosen to rest on the "binding" effect of the invoice, to the extent it was binding in and of itself, rather than inducing Thomas to sign the bill of sale by offering the "escrow" arrangement.  The evidence shows that he did not.  In order to obtain the "additional document committing [Thomas] on this picture" that Edelman "needed . . . in [his] hand signed prior to the closing," Edelman proposed an arrangement under which the parties understood that the document would remain inoperative until such time as Art International had received funds from its buyer.  (*See* Edelman Tr. 111:6-17.)  That intent was to create a condition precedent to the validity of the agreement, one which has not been fulfilled and whose fulfillment cannot be excused for lack of materiality.

Accordingly, the agreement cannot be the basis for a breach of contract claim, and judgment must be entered in favor of Art International.  *See Oppenheimer*, 660 N.E.2d at 418.

## CONCLUSION

For the reasons given, plaintiff has failed to prove its claim by a preponderance of the evidence. The Clerk of the Court is directed to enter judgment for the defendant and close this case.

SO ORDERED.

Dated: New York, New York
      January 24, 2012

Richard J. Holwell
United States District Judge

33